**[Cite as *State v. J.L.S.*, 2026-Ohio-363.]**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                              :

    Plaintiff-Appellee,           :

                                  No. 23AP-69
v.                                         :    (C.P.C. No. 20CR-1787)

[J.L.S.],                                  :    (REGULAR CALENDAR)

    Defendant-Appellant.          :

D E C I S I O N

Rendered on February 5, 2026

**On brief:** [*Shayla D. Favor*], Prosecuting Attorney, and *Michael A. Walsh*, for appellee. **Argued:** *Michael A. Walsh.*

**On brief:** [*Mitchell A. Williams*], Public Defender, and *Leon J. Sinoff*, for appellant. **Argued:** *Leon J. Sinoff.*

APPEAL from the Franklin County Court of Common Pleas

LELAND, J.

{¶ 1} Defendant-appellant, J.L.S., appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which the jury returned verdicts finding him guilty of two counts of gross sexual imposition and one count of attempted rape.

## I. Facts and Procedural History

{¶ 2} On April 21, 2020, appellant was indicted on two counts of gross sexual imposition in violation of R.C. 2907.05, one count of attempted rape in violation of R.C. 2907.02 and 2923.02, and one count of sexual imposition in violation of R.C. 2907.06. The alleged victim was J.S., appellant's biological daughter.

{¶ 3} The matter came for trial before a jury beginning on January 9, 2023. The first witness for plaintiff-appellee State of Ohio was T.S., at the time of trial age 30. At the

time of trial, appellant and T.S. had been married eight years, and they lived together four years before the marriage. T.S. has six children; she and appellant have three children together. Although they are still married, their relationship ended in 2019. During the time T.S. and appellant were together they moved to four different residences, including three different apartments.

{¶ 4} In 2014, when T.S. and appellant started dating, T.S. began to interact with J.S., appellant's daughter from a prior relationship; J.S. was ten years of age at that time, and she lived with her mother, S.D. Beginning in 2015, J.S. began spending several days at a time at the residence shared by appellant and T.S., including visits on weekends.

{¶ 5} T.S. testified regarding events on July 17, 2019. At approximately 5:00 a.m., T.S. observed appellant "touching his daughter [J.S.] sexually on her breasts." (Tr. Vol. 2 at 219.) T.S.'s family members were sleeping downstairs at the time because the upstairs rooms were hot in the summer. T.S. "was in the living room on a bed," and J.S. and appellant were in the dining room "on the floor." (Tr. Vol. 2 at 220.) T.S. testified: "He [appellant] would lift her arm up and see if she's, like, asleep. . . . He would do that a couple times. He would touch her again on her breasts." (Tr. Vol. 2 at 219.) T.S. further testified: "I didn't see everything because a wall was right there, but, like her body is shaking. It's looking like he was making her jack him off because when she was woke up she's like, 'Why does my hand feel funny?' " (Tr. Vol. 2 at 219-20.)

{¶ 6} T.S. "was fake sleeping on a bed with one eye open and looking at what he was doing because it looked like he was trying to be sneaky." (Tr. Vol. 2 at 220.) Appellant was sitting close to J.S., and "[h]e would stop and then look to see if anybody was looking and do it again." (Tr. Vol. 2 at 220-21.) J.S. "was wearing a shirt, and he was going under her clothes." (Tr. Vol. 2 at 223.) J.S. "was asleep" at the time. (Tr. Vol. 2 at 229.)

{¶ 7} That morning, T.S.'s son had a scheduled dialysis treatment at a hospital, and T.S. decided she would "call the police" following the treatment. (Tr. Vol. 2 at 234.) While at the hospital, T.S. told J.S. "what happened to her." (Tr. Vol. 2 at 235.) J.S. did not remember the incident. J.S. "just said, 'Don't tell nobody. Don't call the cops. Please don't call the cops.' " (Tr. Vol. 2 at 235.)

{¶ 8} T.S. called the police later that afternoon, and she also confronted appellant. The police arrived and spoke with T.S. and appellant. T.S. told the police: "I seen

[appellant] and [J.S.] on the floor, like around 5:00 o'clock in the morning. [Appellant] was touching on his daughter sexually and doing some other stuff. I didn't see everything because the wall was right there." (Tr. Vol. 2 at 242-43.) J.S.'s mother arrived and took her home. T.S. stated she called the police because "[h]e shouldn't be touching on a little girl like that. . . . I felt hurt because he's supposed to be my husband, and I'm not understanding why are you touching on a little girl?" (Tr. Vol. 2 at 243.) T.S. testified that she and appellant separated "that day in 2019." (Tr. Vol. 2 at 244.)

{¶ 9} T.S. "went to a domestic violence shelter after that" because she and appellant "got in a fight." (Tr. Vol. 2 at 244.) The fight ensued after T.S. found an old phone belonging to appellant in an upstairs dresser; T.S. "went through his phone to see if he had any messages of him and his daughter texting." (Tr. Vol. 2 at 248.) T.S. took pictures of text messages from the phone. T.S. testified the text messages were between appellant and J.S. Appellant discovered that T.S. took pictures of the text messages, and he told her that he threw the phone away.

{¶ 10} Jennifer Sherfield is a forensic interview specialist who has conducted "over 3,500" forensic interviews. (Tr. Vol. 2 at 317.) She previously worked at Nationwide Children's Hospital as a forensic interviewer. Sherfield testified the purpose of a forensic interview is "to provide children an opportunity to talk through what their experiences have been." (Tr. Vol. 2 at 319.) She stated that the information is utilized to assist with further medical treatment of a child.

{¶ 11} Sherfield interviewed J.S. on July 29, 2019, and the witness prepared a written medical report introduced at trial as state's exhibit C1. During the forensic interview, J.S. described sexual conduct by appellant that J.S. indicated "start[ed] around" the time she was 11 or 12 years old. (Tr. Vol. 2 at 332.) J.S. "talked about different houses where things occurred, but all around the age of 12." (Tr. Vol. 2 at 338.) In her forensic report, Sherfield made a recommendation that J.S. seek therapy.

{¶ 12} J.S., at the time of trial age 16, testified for the state. J.S., the biological daughter of appellant, did not meet appellant until she was 7 years of age. Appellant was living with his grandmother at the time, and J.S. described her relationship with appellant then as "pretty normal." (Tr. Vol. 2 at 373.) J.S. stated that when she first met appellant's wife, T.S., "[s]he was nice to me, and then . . . later down the road, we got closer." (Tr. Vol. 2

at 375.) T.S. and appellant eventually had their own residence; J.S. would visit them, usually on weekends. T.S. and appellant moved to different residences, and J.S. "visited them at more than one house." (Tr. Vol. 2 at 379.)

{¶ 13} J.S. testified the relationship with appellant was normal until she reached the age of "11, 12." (Tr. Vol. 2 at 374.) J.S. described the first time her relationship with appellant changed. J.S. recalled being at her mother's house, and she was sitting in a white van with appellant; appellant was "in the front seat" and J.S. was in "the passenger seat." (Tr. Vol. 2 at 380.) Appellant "had his pants on but . . . the tip of his penis . . . was . . . in his waistband. He wanted me to see it because it was obvious." (Tr. Vol. 2 at 380.) Appellant and J.S. were the only individuals in the car at the time. J.S. felt "uncomfortable and confused" at the time. (Tr. Vol. 2 at 381.) The incident occurred in 2017, and J.S. was "[p]robably 11" at the time. (Tr. Vol. 2 at 381.)

{¶ 14} J.S. recalled several times when appellant would drop her off from a visit and "he would walk me to my door at my house, but . . . when he hugged me he would try to push his whole body up against me when he was hugging me." (Tr. Vol. 2 at 382-83.) This behavior occurred "more than once" when she was "11, 12" years of age. (Tr. Vol. 2 at 383.)

{¶ 15} Appellant also made "strange comments," and once told J.S.: " 'You would be surprised of how many . . . fathers and daughters have that type of relationship.' " (Tr. Vol. 2 at 383.) She described that type of relationship as "where . . . a father will have . . . a sexual attraction to his daughter." (Tr. Vol. 2 at 384.) Appellant told her "it will only be like that to me because he didn't raise me, but it wouldn't be like that towards my other siblings because he was actually . . . in their life when they was little and he raised them." (Tr. Vol. 2 at 385.) J.S. felt "really uncomfortable" about appellant relating to her a sexual attraction. (Tr. Vol. 2 at 386.) After that conversation, their relationship was "more distant than what it was." (Tr. Vol. 3 at 387.)

{¶ 16} J.S. related an incident in the house when she and appellant were "play fighting" and "he was trying to push himself . . . up against me, like, multiple times when we was doing that." (Tr. Vol. 2 at 388.) J.S. recalled "lots of times where he would try to make me . . . touch him in that type of way," meaning "touch or rub his penis area." (Tr. Vol. 2 at 388.) Appellant would "say . . . that helped him." (Tr. Vol. 2 at 389.) When he asked her to touch him, appellant's pants were on. Appellant would also want J.S. to

touch inside his pants. Appellant would "ask me . . . to touch his penis, or he would try to . . . grab my hand and make me touch it or rub it." (Tr. Vol. 2 at 391.) Later, he "would ask me . . . 'Can you put it in your mouth,' and stuff like that." (Tr. Vol. 2 at 391.)

{¶ 17} J.S. related one incident in which appellant forced her to take his penis into her mouth. They were in the van at night; J.S. was in the passenger seat and her stepbrother was asleep in the back. Appellant was in the front seat and "[h]e had pulled his pants down" and "[h]e grabbed my head, and he forced his penis inside my mouth." (Tr. Vol. 2 at 392.) J.S. stated: "I was trying to move" and "[h]e wasn't letting me. He just kept pushing my head down." (Tr. Vol. 2 at 392.) Appellant "kept over and over . . . telling me to suck it." (Tr. Vol. 2 at 393.) J.S. felt "sad and uncomfortable," and "[i]t was . . . a lot of emotions at once." (Tr. Vol. 2 at 393.)

{¶ 18} On another occasion, J.S. recalled waking up in the middle of the night and appellant's "penis was . . . in my face." (Tr. Vol. 2 at 394.) J.S. testified appellant "was hovering over me," and he was "trying to put it in my mouth, but I kept trying to move away." (Tr. Vol. 2 at 394.) She stated appellant's penis "did touch my mouth." (Tr. Vol. 2 at 395.) J.S. kept "trying to turn away," and after she "kept doing that, he did end up getting out" and "went to the bathroom." (Tr. Vol. 2 at 396.) J.S. stated this incident occurred at the house where T.S. and appellant resided, when she was 12 years of age. J.S. felt "sad, uncomfortable, disgusted." (Tr. Vol. 3 at 409.) She did not tell anyone at the time.

{¶ 19} J.S. also testified appellant "made . . . comments about my body," and "said I was developing." (Tr. Vol. 3 at 418.) On one occasion, J.S. related, as they were about to enter the apartment of appellant's sister, appellant gave her "one of those hugs . . . [a]nd then he got my hand, and he was trying to . . . move it towards his pants area, like, trying to make me touch right there," meaning "[h]is penis." (Tr. Vol. 3 at 419-20.) On other occasions, appellant would try to make her touch his penis; if J.S. "just kept pulling away, . . . he would eventually stop." (Tr. Vol. 3 at 422.) J.S. testified appellant "would touch my vagina and my boobs and my butt." (Tr. Vol. 3 at 424.) J.S. was wearing clothing at the time.

{¶ 20} J.S. would "[s]ometimes" text appellant. (Tr. Vol. 3 at 426.) Once, when J.S. and appellant were "in the same room" at her mother's house, they texted each other; J.S. testified appellant "was trying to get me to another room . . . like, a bathroom or closet, one

of those." (Tr. Vol. 3 at 427.) J.S. "remember[ed] he was trying to . . . convince me to put his penis in my mouth." (Tr. Vol. 3 at 428.) J.S. testified: "I remember I kept trying to avoid it, like make excuses. A lot of my family . . . was in the house, but they wasn't in the same room that we were in." (Tr. Vol. 3 at 428.)

{¶ 21} At trial, J.S. identified the state's exhibit A1 as a screenshot depicting her cell phone number and a text conversation. J.S. stated she recognized the conversation. In the text, "[appellant] said, 'Can we be alone for a second?' " (Tr. Vol. 3 at 431-32.) J.S. responded: " 'Nowhere to go.' " (Tr. Vol. 3 at 432.) J.S. stated she was trying to avoid appellant with her response. In another text, J.S. inquires: " 'What do you want to do?' " (Tr. Vol. 3 at 435.) In the response, "[h]e said, 'Hold it in your mouth for a second. Please. It helps me so much.' " (Tr. Vol. 3 at 435.) J.S. responded by text: " 'I don't do that anymore. I found out that was nasty lol and I haven't done that in a while. Don't you gotta wife for that?' " (Tr. Vol. 3 at 436.)

{¶ 22} J.S. recalled another occasion, when she was 11 or 12 years old, that appellant "sent a picture of his penis to my phone." (Tr. Vol. 3 at 455.) J.S. "deleted it" because she did not want her mother "to go through my phone and see that." (Tr. Vol. 3 at 455.)

{¶ 23} J.S. testified that she was informed by T.S. about an incident in July 2019 when J.S. was asleep. After T.S. "told [her] about" the incident, J.S. was "sad" but also "was more . . . panicking[,]" because "at that point, [she] knew it was going to get to [her] mom." (Tr. Vol. 3 at 441.) J.S. "wanted to tell her myself." (Tr. Vol. 3 at 441.) J.S. did not want her mother "to feel like it was her fault." (Tr. Vol. 3 at 442.) J.S. initially asked T.S. not to tell her mother.

{¶ 24} T.S. and J.S. were at Nationwide Children's Hospital when T.S. told her about the alleged incident. J.S. felt it was her fault "because I didn't tell anybody." (Tr. Vol. 3 at 445.) That afternoon, J.S. spoke with police officers and "they asked me a bunch of questions, and I said no to every one of their questions." (Tr. Vol. 3 at 447.) J.S. testified she responded no because her mother "still didn't know[,]" and appellant "was trying to put it in my mom's head that it didn't happen." (Tr. Vol. 3 at 448.) J.S. "wasn't going to tell somebody it happened if they wouldn't believe me." (Tr. Vol. 3 at 448.)

{¶ 25} Later that day, J.S.'s grandfather "sent the [text] messages" to J.S.'s mother's phone. J.S.'s mother showed the messages to J.S., and J.S. started "crying." (Tr. Vol. 3 at

450.) That same day, J.S. told her mother: " 'Yeah, it did happen.' " (Tr. Vol. 3 at 451.) J.S. told her mother " 'he . . . used to touch me.' " (Tr. Vol. 3 at 452.)

{¶ 26} At trial, the parties entered into a stipulation that "the incident date where [T.S.] reported the action that she saw [appellant] commit against [J.S.] was July 17, 2019." (Tr. Vol. 3 at 473.)

{¶ 27} On July 17, 2019, Columbus Police Detective David McGuire responded to a report of "allegations concerning a child victim." (Tr. Vol. 3 at 481.) The detective testified that, upon arriving at a residence and observing several individuals standing outside, appellant "approached me when I began speaking and said, 'Hey, I know why you're here.' " (Tr. Vol. 3 at 484.) Detective McGuire spoke with J.S. "in the car separate from" J.S.'s mother and appellant. (Tr. Vol. 3 at 485.) J.S. "acknowledged that one of the things that [appellant] told me when I got there had to do with rubbing some bugbites," and J.S. "said, 'I have a lot of bugbites,' and she showed me several." (Tr. Vol. 3 at 485.) When the detective specifically asked about "touching on private parts[,]" J.S. said at the time: " 'There was nothing like that that had taken place as far as touching sexual parts.' " (Tr. Vol. 3 at 486.)

{¶ 28} Detective McGuire also spoke with appellant, who "said that he had kind of an estranged relationship with [T.S.] and he said, 'Hey, I was rubbing the bugbites. There hasn't been any type of sexual touching.' " (Tr. Vol 3 at 487.)

{¶ 29} At the time of trial, Gail Hornor was a pediatric nurse practitioner, "practicing as a forensic nurse specialist for the International Association of Forensic Nurses." (Tr. Vol. 4 at 519.) Hornor previously was employed at Nationwide Children's Hospital. She has examined "close to 4,000 children where there's been a concern of sexual abuse." (Tr. Vol. 4 at 522.) The parties stipulated as to Horner's qualifications to testify as an expert.

{¶ 30} Horner testified that, once the forensic interview concludes, "the forensic interviewer always meets with the medical provider to discuss the child's disclosure." (Tr. Vol. 4 at 526.) Horner stated "the forensic interview guides medical assessment and diagnosis, because based on the disclosures that the child makes in the forensic interview, it influences, for instance, what testing we may or may not do for sexually-transmitted infections." (Tr. Vol. 4 at 526.) The medical examination also includes screening questions.

{¶ 31} Horner testified she performed the physical examination of J.S., but J.S. "declined the anogenital exam." (Tr. Vol. 4 at 530.) Horner reviewed with the forensic interviewer the disclosures made by J.S.

{¶ 32} Appellant testified on his own behalf. Appellant, at the time of trial age 38, is the father of J.S. and "three other children." (Tr. Vol. 4 at 562.) J.S.'s mother is S.D., while the mother of appellant's other three children is T.S.

{¶ 33} Appellant testified he is "estranged from my daughter, [J.S.]," but he stated "[i]t was a normal relationship." (Tr. Vol. 4 at 563.) Appellant "met [J.S.] when she was seven years old." (Tr. Vol. 4 at 565.) Appellant explained that: "Before that, I committed a crime, and I did go to prison for it. It was a robbery." (Tr. Vol. 4 at 565.) Appellant was 20 years of age at the time of his conviction for robbery.

{¶ 34} Appellant stated his relationship with J.S. "was good" after his release from prison in November 2013. (Tr. Vol. 4 at 567.) Appellant testified that he and J.S. "would go out, explore the neighborhood, ride bikes, watch TV[,]" and that J.S. "was tough, so roughhousing, wrestling" and "[p]laying like that." (Tr. Vol. 4 at 568.) He stated the physical contact "was back and forth. Sometimes it was me; sometimes it was her. I don't know who did it more, but it was mutual." (Tr. Vol. 4 at 568.)

{¶ 35} Appellant testified that July 17, 2019 "was typical." (Tr. Vol. 4 at 570.) Appellant stated "[m]y daughter was asleep" and "[n]othing was done out of the ordinary." (Tr. Vol. 4 at 570.) According to appellant, he woke up that morning, "walked around the house, seeing if anybody is up." (Tr. Vol. 4 at 571-72.) J.S. "was asleep against the wall." (Tr. Vol. 4 at 572.) Appellant stated J.S. had bug bites and "I kind of like noticed her shirt was up a little bit, and that's when I, like, pushed it down a little bit." (Tr. Vol. 4 at 572.)

{¶ 36} Later that morning, the family took appellant's son to a hospital for a dialysis treatment; appellant was in a room with his son when he began receiving texts from T.S. In one of the texts, "[s]he said, 'I know what you did to your daughter.' " (Tr. Vol. 4 at 575.) Appellant responded by asking T.S. what she was talking about. T.S. then "said, 'I seen you touching your daughter,' along that nature, 'touching your daughter.' " (Tr. Vol. 4 at 576.) After a while, appellant stopped responding and "just let her say what she said." (Tr. Vol. 4 at 576.) When they arrived home, T.S. "continued to make her allegations." (Tr. Vol. 4 at 577.) Appellant "listened" and then "said, 'We're leaving. We're gonna go somewhere.' "

(Tr. Vol. 4 at 577.) Appellant took his three children, including J.S., "to COSI." (Tr. Vol. 4 at 580.) After leaving COSI, appellant took J.S. to her mother S.D.'s house.

{¶ 37} After arriving at S.D.'s residence, appellant "became aware that [S.D.] also was informed that she feels that something happened." (Tr. Vol. 4 at 583.) Appellant and S.D. "talked about it." (Tr. Vol. 4 at 583.) A short time later "a detective came." (Tr. Vol. 4 at 584.) Appellant approached the detective and "told him who I was. 'I know what you're here for.' " (Tr. Vol. 4 at 586.) The detective told appellant he first wanted to talk to J.S. and her mother. The detective spoke with S.D. first, and then J.S. Appellant went to the detective's vehicle and the detective questioned him about the allegations. Appellant denied he had touched J.S. " 'in a sexual way.' " (Tr. Vol. 4 at 589-90.) Appellant informed the detective about the bug bites.

{¶ 38} Appellant later learned "someone said that they found some texts of me going back and forth[,]" and he was "informed that some texts had been found between me and [J.S.]." (Tr. Vol. 4 at 593.) Appellant had "no idea where they came from." (Tr. Vol. 4 at 594.) S.D. "confronted" appellant "about the texts." (Tr. Vol. 4 at 594.) Appellant then learned the texts came from T.S. Appellant denied touching J.S. in a sexual way on July 17, 2019. He also denied he had anything to do with the text messages.

{¶ 39} Following deliberations, the jury found appellant guilty as to Count 1 (gross sexual imposition), Count 2 (gross sexual imposition) and Count 3 (attempted rape), and not guilty as to Count 4 (sexual imposition). By judgment entry filed on January 19, 2023, the trial court sentenced appellant to a term of 36 months on Count 1, a term of 36 months on Count 2, and an indeterminate sentence of a minimum of 6 years, with a maximum penalty of up to 9 years, as to Count 3, with all counts to be served consecutive to each other. The trial court's entry found appellant had 10 days of jail-time credit.

## II. Assignments of Error

{¶ 40} Appellant appeals and assigns the following five assignments of error for our review:

> [I.] The Trial Court's Exclusion of Appellant from the Selection of His Jury Violated Appellant's Constitutional Right to be Present at His Trial.
>
> [II.] Appellant Was Denied His Constitutional Right to the Effective Assistance of Counsel.

[III.] Appellant's Convictions are Against the Manifest Weight of the Evidence.

[IV.] Appellant's Convictions Must Be Reversed Due to Cumulative Error.

[V.] The Trial Court Erred in Calculating Appellant's Jail-Time Credit.

{¶ 41} On April 8, 2025, appellant filed a motion for leave to file a supplemental brief, which this court granted; that brief sets forth the following supplemental assignment of error:

[VI.] The Trial Court's Willful Decision to Forego Recording of a Key Stage of a Serious Criminal Trial Denied Appellant His Constitutional Rights to Due Process of Law and His Opportunity for Meaningful Appellate Review.

## III. Discussion

{¶ 42} Appellant's first and sixth assignments of error are interrelated and will be considered together. Under his first assignment of error, appellant argues he was denied the right to be present in the courtroom at a critical stage of his trial; specifically, appellant contends he was absent during the exercise of peremptory juror strikes. Under the sixth (supplemental) assignment of error, appellant argues the trial court's decision to forego recording a key stage of his trial constituted a denial of due process and the opportunity for meaningful review.

{¶ 43} In asserting he was absent during juror strikes, appellant maintains there is nothing in the record indicating his presence during a private, off-the-record conference by the trial court on the second day of trial. Specifically, appellant notes that during the first day of voir dire, after the parties had agreed to a "for-cause strike of one juror," the court adjourned at 4:35 p.m. (Appellant's Brief at 26.) Appellant argues that when court resumed the next morning, the trial court declared "it had conducted juror strikes 'off the record,' in a private and unrecorded proceeding." (Appellant's Brief at 14.)

{¶ 44} In support, appellant cites to the following portion of the record from the morning of the second day of trial:

THE COURT: All right. Let's get on the record. . . .

> [W]e went through our peremptories off the record. I'm going to summarize what we did. The State of Ohio excused Juror No. 6, Ms. [P.]. They excused Mr. [M], Juror No. 8; Mr. [T], Juror No. 13; and Mr. [L], Juror No. 11. At least that's the order they were in as they were excused. So [P], [M], [T], [L] excused by the State.
>
> Defense, [C], [A], [B] excused. The defense passed on one. We agreed for cause to excuse Mr. [D], Mr. [D] and Mr. [P].
>
> Does that accurately summarize what we did for the State of Ohio?
>
> [THE PROSECUTOR]: Yes, Your Honor.
>
> THE COURT: And there's no objection to that process?
>
> [THE PROSECUTOR]: No objection to that process, Your Honor.
>
> THE COURT: The defense?
>
> [DEFENSE COUNSEL]: Yes, Your Honor, no objections.

(Tr. Vol. 2 at 173-74.)

{¶ 45} According to appellant, he "was neither present for this important part of his trial nor able to meaningfully participate in it." (Appellant's Brief at 14.) Appellant further maintains he was prejudiced by his absence "because Prospective Juror #12, . . . who he wished to strike, was not struck by his counsel in the private, unrecorded proceeding and served on the jury through final verdict." (Appellant's Brief at 15.)

{¶ 46} The Supreme Court of Ohio "has recognized that '[a]n accused has a fundamental right to be present at all critical stages of his criminal trial.' " *State v. Hawkins*, 2011-Ohio-6658, ¶ 47 (10th Dist.), quoting *State v. Frazier*, 2007-Ohio-5048, ¶ 159, citing Section 10, Article I, Ohio Constitution; Crim. R. 43(A). An accused's absence, however, " 'does not necessarily result in prejudicial or constitutional error.' " *Id.*, quoting *Frazier* at ¶ 159. Under Ohio law, "Crim.R. 43(A) incorporates a defendant's due process right to be physically present." *State v. Harris*, 2023-Ohio-3271, ¶ 35 (2d Dist.), citing *State v. Williams*, 6 Ohio St.3d 281, 286 (1983). Crim.R. 43(A)(1) states in part: "Except as provided in Crim.R. 10 and divisions (A)(2) and (A)(3) of this rule, the defendant must be

physically present at every stage of the criminal proceeding and trial, including the impaneling of the jury, the return of the verdict, and the imposition of sentence, except as otherwise provided by these rules."

{¶ 47} While a criminal defendant has the right to be present at all stages of his trial, the Supreme Court has held "the record must affirmatively indicate the absence of a defendant or his counsel during a particular stage of the trial." *State v. Clark*, 38 Ohio St.3d 252, 258 (1988). In this respect, "when the record is silent, a reviewing court will not presume that the defendant and/or his counsel were absent." *State v. Beasley*, 2018-Ohio-493, ¶ 144, citing *Hawkins* at ¶ 49.

{¶ 48} We note, at the outset, the record indicates counsel for appellant did not object to appellant's purported absence during juror strikes, and therefore "the alleged error is reviewed under a plain error analysis." *State v. Toney*, 2020-Ohio-5044, ¶ 8 (7th Dist.). Pursuant to Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Under Ohio law, "[a]n alleged error is plain error only if the error is 'obvious,' and where, but for the error, the outcome of the proceeding would clearly have been otherwise." *Toney* at ¶ 8, citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002); *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph two of the syllabus.

{¶ 49} We also initially note that, subsequent to briefing in this case, appellant filed with this court a November 27, 2024 motion to supplement the record on appeal pursuant to App.R. 9(E). Specifically, appellant sought to supplement the record with his affidavit "memorializing his recollection of the unrecorded peremptory strike process in his trial." (Nov. 27, 2024 Mot. to Supp. Record at 1.) Further, on December 10, 2024, appellant filed a motion for leave to supplement the record with a statement of the evidence, pursuant to App.R. 9(C), outside the time contemplated by rule. Appellant's motion made a request that "the parties and the trial court engage in that rule's demarcated process to produce a statement of the proceedings when no recording was made." (Dec. 10, 2024 Mot. for Leave at 2.)

{¶ 50} On December 12, 2024, appellant filed his proposed statement of the proceedings pursuant to App.R. 9(C). Attached to the proposed statement was appellant's

own affidavit.  On January 21, 2025, the state filed its response to appellant's App.R. 9(C) statement, which included objections and proposed amendments.

{¶ 51}  By entry filed on February 20, 2025, this court denied appellant's motion to supplement the record pursuant to App.R. 9(E).  With respect to appellant's motion to supplement the record with a proposed App.R. 9(C) statement, we granted the motion "to the extent that appellant's proposed 9(C) statement and appellee's objections and proposed amendments thereto are hereby submitted to the trial court for settlement and approval." This court's entry further provided: "The trial court shall file a settled and approved 9(C) statement with the clerk of the trial court that, to the extent possible, answers the question of whether appellant was present during the exercise of the parties' peremptory challenges."

{¶ 52}  On April 1, 2025, the trial court filed an "order and judgment entry settling and approving App. Rule 9(C) statement."  That order and entry included, as exhibits, the affidavits of Chynna Kelley, Gerald Noel, and appellant.  On April 8, 2025, the state filed a motion to supplement the record with the trial court's order and judgment entry of April 1, 2025.  On that same date, this court filed a journal entry granting the state's motion to supplement the record "with the trial court's April 1, 2025 order and judgment entry that settled and approved the App.R. 9(C) statement," and we ordered the clerk of the trial court to transmit the trial court's order and judgment entry to the clerk of this court for filing as a supplemental record.

{¶ 53}  The trial court's order and judgment entry, settling and approving the App.R. 9(C) statement, provides in relevant part as follows:

This matter is before the Court upon the Court of Appeals' App.R. 9(C) directive to this Court to settle an issue that was not recorded in the transcript.  The Defendant-Appellant posits that he was not present during the peremptory strikes for jury selection.  The strikes were conducted off the record. Plaintiff-Appellee contends that the Appellant was present during the strikes.  Both parties have submitted proposed statements.

The Court obtained an Affidavit from Chynna Kell[e]y, the trial prosecutor of the case, and obtained the Affidavit from the Appellant's trial counsel, Gerald Noel.  The Court has no personal recollection as to whether the Defendant-Appellant was present for the strikes.  However, the Court notes that in his 15-year tenure as a Judge, the record would always

disclose, or reflect, if a Defendant was not present during any phase of the trial. The Court Reporter and the Court would note on the record the absence of the Defendant and require either defense counsel to waive the Defendant's appearance or require the presence of the Defendant. The transcript does not note the Defendant-Appellant's absence.

Ms. Kell[e]y and Mr. Noel's Affidavits both affirm the presence of the Defendant and his participation in the exercise of the peremptory strikes. The Defendant-Appellant claims he was not present and would have voiced his request to strike several jurors. Mr. Noel['s] best recollection is that Appellant was present for the peremptory strikes. Mr. Noel also states that it is his practice to confer with his clients regarding strikes. He also avers that he will at times keep jurors in a case even if his client would like them off the jury. Ms. Kell[e]y specifically recalls Appellant being present during the strike process and that he conferred with Mr. Noel. Both attorneys agree the process took place in the courtroom. The Defendant-Appellant, through counsel, exercised 3 of his 4 peremptory challenges[.]

The Court has reviewed all the Affidavits filed, including the Appellant's, the Court's own recollection and practice in trials, and all the information set forth above. The Court makes the following findings pursuant to App. R. 9(C):

1. No transcript exists of the peremptory strikes because the Court Reporter was late that morning, and the Court wanted to keep the trial on schedule because of both the Court's trial docket and jurors' schedules of serving only one week.

2. The Defendant-Appellant was present for the peremptory challenges in the courtroom and participated with defense counsel in exercising the strikes.

3. The Defendant-Appellant never voiced or expressed any dissatisfaction with the composition of the jury.

4. The Defendant-Appellant was present in the Courtroom during all phases of the trial.

(Footnote omitted.) (Apr. 1, 2025 Order & Jgmt. Entry at 1-3.)

{¶ 54} As noted, attached to the trial court's App.R. 9(C) statement were the affidavits of three individuals: (1) Chynna Kelley, the trial prosecutor in the case; (2) Gerald

Noel, counsel for appellant in the underlying proceedings; and (3) appellant. The affidavit of Kelley, attached as exhibit A, stated in part as follows:

> 1. I am currently employed as a Magistrate in the Franklin County Court of Common Pleas.
>
> 2. Prior to my current employment, I represented the State of Ohio in the case of *State of Ohio v.* [*J.L.S.*], 20CR-1787.
>
> 3. On January 10, 2023 we began trial with jury selection.
>
> 4. I performed voir dire and jury strikes for the State.
>
> 5. The next day of trial, we performed peremptory challenges off-the-record in the courtroom.
>
> 6. [J.L.S.] was on-time that day.
>
> 7. I remember the Defendant, [J.L.S.], being present during peremptory challenges.
>
> 8. I remember the Defendant, [J.L.S.], conferring with his attorney, Gerald Noel.
>
> 9. I conferred with a fellow attorney who was observing during this time.
>
> 10. My understanding is we performed the strikes off-the-record because the Judge wanted to remain on time with the trial.
>
> 11. There was an issue with the court reporter, though I do not know what, that caused us to be off-the-record.
>
> 12. Multiple jurors had conflicts, so it was important for us to remain on-time with jury selection to avoid strikes.

(Ex. A Kelley Aff., attached to Apr. 1, 2025 Order & Jgmt. Entry.)

{¶ 55} The affidavit of Noel, attached as exhibit B, stated in part as follows:

> 1. I am a licensed Ohio attorney.
>
> 2. I represented Defendant [J.L.S.] in Case No. 20CR-1787.
>
> 3. On January 10, 2023, we began trial with jury selections.
>
> 4. I performed voir dire and jury strikes for [J.L.S.].

5. Peremptory strikes in this case took place in the courtroom at counsel tables.

6. To the best of my recollection, I believe [J.L.S.] was present during peremptory strikes.

7. My standard procedure is to have my clients take notes during voir dire, and I confer with them prior to strikes.

8. I occasionally keep jurors on the panel despite my clients wanting them off I believe it is best for the case.

(Ex. B Noel Aff., attached to Apr. 1, 2025 Order & Jgmt. Entry.)

{¶ 56} Attached as exhibit C was the affidavit of appellant, who stated in part:

I was not present during my jury selection, for juror strikes. My understanding is that I would pick my jurors and I did not get to. My lawyer never asked me my opinion who I wanted to strike.

Tuesday morning I arrived to court on time and waited in the lobby for court to begin as usual until my lawyer let me know court was starting and came and got me from the lobby.

When I got into the courtroom and was seated waiting for the judge to enter to begin after he began stating things for the record that is when the jury was called. That is when I learned that they had already been picked without me.

I thought I would have a say in who they would be.

That is when I noticed a juror that I did not like was picked. I learned his name was Mr. [J.] from reading the transcript.

I did not like him because of his answers and demeanor. Because of this I would not have wanted him as a juror. If I had the choice, I would have struck him as my first choice.

(Ex. C Appellant Aff., attached to Apr. 1, 2025 Order & Jgmt. Entry.)

{¶ 57} We further note the parties filed, on April 8, 2025, a joint statement of App.R. 9(C) proceedings. In that statement, the parties summarized and set forth the procedural background regarding the manner in which the trial court addressed the App.R. 9(C) request and approved the App.R. 9(C) statement.

{¶ 58} This court subsequently permitted the parties to file supplemental briefing as a result of the trial court's App.R. 9(C) statement. Appellant filed a supplemental brief on

May 8, 2025, and the state filed its supplemental brief on June 9, 2025. In his briefing, appellant has supplemented his first and second assignments of error, and added his sixth assignment of error. Accordingly, we now address appellant's first and sixth assignments of error in light of the original and supplemental record, including the trial court's App.R. 9(C) statement, as well as the supporting affidavits of the former prosecutor, defense counsel, and appellant.

{¶ 59} In his supplemental brief, appellant "concedes" the trial court's finding, in the App.R. 9(C) statement, that appellant " 'was present for the peremptory challenges in the courtroom and participated with defense counsel in exercising the strikes.' " (Appellant's Supp. Brief at 1.) Appellant maintains, however, the court's finding "relies entirely on new evidence" which he argues "is both facially unconvincing and was never subjected to any adversarial testing." (Appellant's Supp. Brief at 3.) Appellant further contends that his affidavit is "more credible than both trial counsel's affidavits." (Appellant's Supp. Brief at 14.) Finally, in his sixth assignment of error, appellant argues the trial court's failure to ensure the peremptory challenge was recorded constituted reversible error under Crim.R. 22.

{¶ 60} In response to appellant's first assignment of error, the state argues the trial court's settled and approved App.R. 9(C) statement indicates appellant was present during peremptory challenges and at all other phases of the trial. With respect to the argument raised under appellant's sixth assignment of error, the state agrees the trial court did not comply with Crim.R. 22, but the state maintains appellant has failed to demonstrate reversible error.

{¶ 61} Under Ohio law, "App.R. 9(C) allows for a statement of the evidence or proceedings if a transcript is unavailable." *State v. Krivinsky*, 1998 Ohio App. LEXIS 2659, *6 (12th Dist. June 15, 1998). App.R. 9(C)(1) states in part as follows:

> If no recording of the proceedings was made, if a transcript is unavailable, or if a recording was made but is no longer available for transcription, the appellant may prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement shall be served on the appellee . . . and the appellee may serve on the appellant objections or propose amendments to the statement. . . . The statement and any objections or proposed amendments shall be forthwith

> submitted to the trial court for settlement and approval. The trial court shall act prior to the time for transmission of the record pursuant to App.R. 10, and, as settled and approved, the statement shall be included by the clerk of the trial court in the record on appeal.

{¶ 62} Pursuant to App.R. 9, a trial court " 'must first determine the accuracy and truthfulness of a proposed statement of the evidence or proceedings or an agreed statement and then approve it and sign it,' " thus giving " 'the trial judge the responsibility, duty, and authority to delete, add, or otherwise modify portions of a proposed statement so that it will conform to the truth and be accurate before he approves it.' " *Espino v. Siladi*, 2009-Ohio-3005, ¶ 12 (9th Dist.), quoting *State v. Schiebel*, 55 Ohio St.3d 71, 81-82 (1990). In the event "a dispute arises, the end result of the trial court's evaluation should be a separate document intended to recite or accurately summarize the evidence that was taken and the relevant procedure that occurred in the trial court." *Id.*, citing *Seals v. Hal Artz Lincoln-Mercury, Inc.*, 1991 Ohio App. LEXIS 902 (8th Dist. Mar. 7, 1991). Further, "[a] trial court's decision regarding App.R. 9 is within its sound discretion," and a reviewing court "will not reverse the trial court's decision to supplement or correct the record absent an abuse of discretion." *State v. Foster*, 2021-Ohio-3408, ¶ 45 (3d Dist.), citing *State v. Cross*, 2008-Ohio-3240, ¶ 33 (7th Dist.).

{¶ 63} At the time of the initial briefing schedule in this appeal, the record was silent on the issue of whether appellant was present during the juror strikes on the morning of the second day of trial. As outlined above, in the face of a silent record, courts do not presume absence but, instead, the record must affirmatively indicate a defendant's absence to establish error. *See, e.g., State v. Darby*, 2011-Ohio-3816, ¶ 22-23 (10th Dist.) (where "record does not affirmatively prove that appellant was absent from the proceedings addressing the questions from the jury," appellant "has failed to meet her burden of showing error by referencing matters in the appellate record which affirmatively demonstrate she was not present"); *Hawkins*, 2011-Ohio-6658, at ¶ 50 (10th Dist.) ("in the absence of an affirmative indication appellant was absent" during reading of *Howard* charge, "we presume his presence"); *State v. Simmons*, 2007-Ohio-1570, ¶ 82 (7th Dist.) (where there is "no affirmative indication either way" whether defendant or his counsel

were absent during trial court's off the record communication with jury, "we presume presence").

{¶ 64} The record in this case, however, is no longer silent on this issue. As noted, following this court's directive, the trial court issued its judgment entry settling and approving an App.R. 9(C) statement providing appellant "was present for the peremptory challenges in the courtroom and participated with defense counsel in exercising the strikes." In reaching that determination, the court cited the affidavits of the former prosecutor, Kelley, as well as appellant's defense counsel, Noel, who "both affirm the presence of [appellant] and his participation in the exercise of the peremptory strikes." The trial court also considered appellant's "claims he was not present and would have voiced his request to strike several jurors."

{¶ 65} In his supplemental briefing, appellant seeks to challenge the evidence relied on by the trial court. Appellant suggests "it is doubtful that App.R. 9(C) even permits a trial court to solicit and consider new evidence." (Appellant's Supp. Brief at 7.) Appellant further argues that, even if App.R. 9(C) permits such evidence, it was an abuse of discretion for the trial court to assign any weight to the untested affidavits.

{¶ 66} As noted by the state, the Supreme Court has held "[w]here there is no record, App.R. 9(C) permits the trial court to hold an evidentiary hearing in order to settle and approve the appellate record." *State v. Jones*, 1994-Ohio-162, 71 Ohio St.3d 293, 297 (1994). Further, this court has held that parties may submit affidavits of evidence to a trial court as part of the court's role in settling issues and adopting an App.R. 9(C) statement. *See Parker v. Ohio Dept. of Rehab. & Corr.*, 2017-Ohio-7415, ¶ 3 (10th Dist.); *Martin v. Buss*, 2022-Ohio-3930, ¶ 12 (10th Dist.) ("Affidavits are allowable statements of evidence but must be served upon the appellee and submitted to the trial court to resolve any objections from appellee, settle the issues and approve in accordance with App.R. 9(C)."). *See also Schiebel*, 55 Ohio St.3d at 82 (discussing affidavits submitted under App.R. 9 and finding "sufficient evidence" presented to support the trial court's decision that additional jury instructions were delivered to jury).

{¶ 67} While appellant argues the affidavits are untested, this court has noted "App.R. 9(C) does not provide for a reply from an appellant after an appellee has objected to the appellant's proffered statement of evidence." *Parker* at ¶ 3. In this respect, "the trial

court does not adopt objections, but can consider the objections when adopting the App.R. 9(C) statement." *Id.* Further, any conflict in the evidence submitted by the parties "is for the trial court to resolve in its sound discretion." *Schiebel* at 82. *See also Medina v. Osiecki*, 2011-Ohio-1534, ¶ 16 (9th Dist.), citing *Schiebel* at 81 ("where a party seeks to have the record corrected, it is within the province of the trial court to resolve disputes about the record on appeal"); *State v. Dickard*, 10 Ohio App.3d 293, 295 (8th Dist.) ("The trial court was required to fulfill its obligations under App.R. 9 independent of any conflict between the parties.").

{¶ 68} In the present case, "the dispute with respect to the appellate record in this case has . . . been submitted to and settled by the trial court." *Osiecki* at ¶ 18. Here, the trial court complied with the procedure set forth in App.R. 9(C), as well as this court's directive, in reaching its determination the evidence indicated appellant was present at all critical stages of his trial. We note, outside of appellant's self-serving affidavit, there is nothing in the record suggesting he was absent during peremptory challenges. While appellant credits his affidavit statement over those of the former prosecutor and his own trial counsel, this court has observed "the court of appeals cannot resolve disputes about the trial court's record in the course of an appeal," but rather "it is the trial court's responsibility to determine the accuracy of a proposed statement of the evidence." *McGuire v. Ohio Dept. of Rehab. & Corr.*, 1996 Ohio App. LEXIS 4274, *9 (10th Dist. Sept. 30, 1996), citing *Schiebel* at 81-82. Here, appellant has failed to demonstrate the trial court abused its discretion in crediting the recollection and statements of the former prosecutor and counsel for appellant over the averments in appellant's affidavit.

{¶ 69} Finally, even assuming we were to disregard the App.R. 9(C) affidavit evidence, this court, as previously outlined, is required to presume regularity in instances where there is no evidence in the record to affirmatively support appellant's assertion that he was absent during peremptory challenges. On review, the record fails to show error, plain or otherwise, regarding appellant's contention the trial court denied his right to be present at all critical stages of the proceedings.

{¶ 70} Appellant contends under his sixth assignment of error that the trial court's willful decision to forgo recording the peremptory challenges deprived him of due process

and the opportunity for meaningful appellate review. Appellant maintains the trial court violated Crim.R. 22, and that such error merits reversal.

{¶ 71} Crim.R. 22 states in part: "In serious offense cases all proceedings shall be recorded." In *State v. Palmer*, 80 Ohio St.3d 543, 554 (1997), the Supreme Court addressed Crim.R. 22 as follows:

> [T]his court has clearly held that reversal of convictions and sentences on grounds of some unrecorded bench and chambers conferences, off-the-record discussions, or other unrecorded proceedings will not occur in situations where the defendant has failed to demonstrate that (1) a request was made at trial that the conferences be recorded or that objections were made to the failures to record, (2) an effort was made on appeal to comply with App.R. 9 and to reconstruct what occurred or to establish its importance, and (3) material prejudice resulted from the failure to record the proceedings at issue.

{¶ 72} In this respect, the Supreme Court "has specifically 'repeatedly refused to reverse convictions or sentences on the basis of unrecorded conferences when a defendant has not' requested that unrecorded conferences be recorded." *Foster*, 2021-Ohio-3408, at ¶ 42 (3d Dist.), quoting *State v. Ketterer*, 2006-Ohio-5283, ¶ 160. *See also State v. Drummond*, 2006-Ohio-5084, ¶ 135, citing *Palmer* at 554 (reiterating "[w]e will not reverse because of unrecorded proceedings when the defendant failed to object and fails to demonstrate material prejudice").

{¶ 73} This court has previously held that a trial court's "failure to adhere to the Crim.R. 22 . . . recording requirements does not require us to automatically reverse" a criminal conviction. *State v. Madden*, 2005-Ohio-4281, ¶ 19 (10th Dist.). Other Ohio courts have held similarly. *See, e.g., State v. Davis*, 2000 Ohio App. LEXIS 3534, *5 (12th Dist. Aug. 7, 2000), quoting *State v. Podborny*, 1985 Ohio App. LEXIS 6763, *2-3 (8th Dist. July 30, 1985) (Noting " '[a] violation of [Crim.R. 22], in and of itself, is not prejudicial error per se [as] [t]he rule makers have made provision for the lack of a record by adopting App.R. 9(C)[.]' ").

{¶ 74} A review of the record indicates counsel for appellant did not object to the trial court's failure to record the peremptory proceedings (i.e., in response to trial court's inquiry, specifically stating "no objections" at the time). (Tr. Vol. 2 at 174.) Even had there

been an objection "to any 'failure to record,' [appellant] would have to show material prejudice." *Foster* at ¶ 43. Here, where the record was supplemented on appeal with the trial court's App.R. 9(C) statement, appellant cannot show material prejudice because, as previously discussed, the statement of evidence indicates appellant's presence during peremptory challenges. Further, in light of the App.R. 9(C) statement, "this court was presented with an adequate record for purposes of conducting appellate review." *State v. Young*, 2021-Ohio-2541, ¶ 88 (12th Dist.), citing *State v. Parrish*, 2002-Ohio-5447, ¶ 46-51 (12th Dist.). *See also Davis* at *7 (trial court's adoption of App.R. 9(C) statement "cured the court's failure to record the sentencing proceedings and adequately perfected the record under App.R. 9(C) and Crim.R. 22").

{¶ 75} We note appellant relies on *State v. Clinkscale*, 2009-Ohio-2746, paragraph one of the syllabus, in which the Supreme Court held "[t]he proceedings in which a deliberating juror is dismissed in a capital case, and an alternate juror is seated, must be recorded." *Clinkscale*, however, is distinguishable as that case addressed Crim.R. 22 in the context of "the unique nature of capital cases [that] demand a heightened level of care in constructing the record to guarantee regularity of the proceedings and assist in appellate review." *Id.* at ¶ 12.

{¶ 76} We note that in *State v. Adams*, 2015-Ohio-3954, ¶ 132, the Supreme Court found *Clinkscale* inapplicable in a case involving an incomplete record and the issue of removal and substitution of "potential" jurors. Specifically, the Supreme Court, noting that its decision in *Clinkscale* "involved the dismissal of a sitting, *deliberating* juror," held that "the removal of a deliberating juror, possibly because that juror is emerging as a 'holdout' on the verdict, implicates constitutional rights in a way very different from any right associated with dismissing a *potential* juror from the jury pool." (Emphasis in original.) *Id.* at ¶ 133, 135. The Supreme Court further noted, under the facts in *Adams*, the trial court "in this case *did* make a record of what occurred after the fact and gave the parties an opportunity to ask questions or be heard." (Emphasis in original.) *Id.* at ¶ 136, citing *State v. Powell*, 2012-Ohio-2577, ¶ 207.

{¶ 77} Accordingly, while the trial court "had a duty to record proceedings in this case," appellant has failed to demonstrate prejudice. *State v. Conner*, 2011-Ohio-146, ¶ 9,

14 (6th Dist.) (although court should have taken steps to ensure proceedings were recorded, he could not show prejudice).

{¶ 78} Based on the foregoing, appellant's first and sixth assignments of error are not well-taken and are overruled.

{¶ 79} Under his second assignment of error, appellant asserts he was denied the right to effective assistance of counsel. Specifically, appellant contends his counsel's performance was deficient in failing to object to (1) the unrecorded juror strikes and to appellant's exclusion from those strikes, (2) improper judicial comments and interjections which reflected judicial bias, (3) prosecutorial misconduct via misstating of evidence, and (4) vouching and bolstering of the accuser's testimony via inadmissible hearsay. Appellant further contends counsel was ineffective in cross-examination of the key witness in the case, and by comments made during closing argument.

{¶ 80} In order to demonstrate ineffective assistance of counsel, appellant "must satisfy a two-pronged test." *State v. Zhu*, 2021-Ohio-4577, ¶ 39 (10th Dist.), citing *State v Jackson*, 2005-Ohio-5981, ¶ 133, citing *Strickland v. Washington*, 466 U.S. 668 (1984). Appellant must first "show that his counsel's performance was deficient because it 'fell below an objective level of reasonable representation.' " *Id.*, quoting *Jackson* at ¶ 133. Second, appellant "must show that his counsel's deficient performance prejudiced his defense so far as to deprive him of a fair trial." *Id.* A "failure to show deficient performance or prejudice will defeat a claim of ineffective assistance of counsel." *Id.*, citing *State v. Lee*, 2018-Ohio-3957, ¶ 35 (10th Dist.).

{¶ 81} In order to establish deficient performance, appellant "must 'show that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment.' " *Zhu* at ¶ 40, quoting *Lee* at ¶ 34. In general, " '[d]ebatable trial tactics . . . do not constitute ineffective assistance of counsel.' " *Id.*, quoting *State v. Elmore*, 2006-Ohio-6207, ¶ 116. Further, "[a] claim of deficient performance 'must overcome the strong presumption that counsel's performance was adequate or that counsel's actions might be considered sound trial strategy.' " *Id.*, quoting *Lee* at ¶ 34. In order to establish prejudice due to alleged deficient performance, appellant "must 'prove there exists a reasonable probability that, but for counsel's errors, the result of the trial would have been different.' " *Id.* at ¶ 41, quoting *Lee* at ¶ 35.

{¶ 82} In raising a claim of ineffective assistance of counsel "based on counsel's failure to file an objection or file a motion, the appellant must demonstrate that the objection or motion had a reasonable probability of success." *State v. Jones*, 2019-Ohio-2134, ¶ 52 (10th Dist.), citing *State v. Johns*, 2011-Ohio-6823, ¶ 25 (10th Dist.), citing *State v. McClellan*, 2010-Ohio-314, ¶ 62 (3d Dist.), and *State v. Adkins*, 2005-Ohio-2577, ¶ 14 (4th Dist.). If an objection "would not have been successful, then the appellant cannot prevail on an ineffective assistance claim." *Id.*, citing *Johns* at ¶ 25, citing *State v. Barbour*, 2008-Ohio-2291, ¶ 14 (10th Dist.).

{¶ 83} Appellant first contends his counsel was ineffective in failing to object to appellant's absence during peremptory challenges. In light of the supplemental record on appeal, as well as our disposition of the first assignment of error, appellant can show neither deficient performance nor prejudice based on this claim.

{¶ 84} In his supplemental brief, the focus of appellant's argument is on trial counsel's failure to object to the trial court's unrecorded discussions regarding peremptory challenges. Even accepting that appellant could show deficient performance, appellant cannot show prejudice as "the trial court in this case *did* make a record of what occurred after the fact." (Emphasis in original.) *Adams*, 2015-Ohio-3954, at ¶ 136. Further, in light of the supplemental record, we have determined the record was sufficient for review.

{¶ 85} Appellant next argues his counsel was ineffective in failing to object to judicial comments and interjections which he contends reflected judicial bias. Appellant first maintains the trial court displayed sympathy toward the victim, J.S., during her testimony.

{¶ 86} Under Ohio law, " '[a] judge is presumed to follow the law and not to be biased, and the appearance of bias or prejudice must be compelling to overcome these presumptions.' " *R.T. v. Knobeloch*, 2018-Ohio-1596, ¶ 59 (10th Dist.), quoting *In re Disqualification of George*, 2003-Ohio-5489, ¶ 5, citing *In re Disqualification of Olivito*, 74 Ohio St.3d 1261 (1994). With respect to the issue of potential judicial bias based on interjections, the Supreme Court has held that " '[i]n a trial before a jury, the court's participation by questioning or comment must be scrupulously limited, lest the court, consciously or unconsciously, indicate to the jury its opinion on the evidence or on the credibility of a witness.' " *State v. Cepec*, 2016-Ohio-8076, ¶ 72, quoting *State ex rel. Wise v. Chand*, 21 Ohio St.2d 113 (1970), paragraph three of the syllabus. In general, "[t]he term

'biased' 'implies a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts.' " *Id.* at ¶ 73, quoting *State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463 (1956), paragraph four of the syllabus. Further, "[t]he Ohio Rules of Evidence authorize a judge to question witnesses," and " '[t]he court may interrogate witnesses, in an impartial manner, whether called by itself or by a party.' " *Id.* at ¶ 70, quoting Evid.R. 614(B).

{¶ 87} In support of his contention the trial court exhibited bias, appellant argues the trial judge "began J.S.'s testimony by asking if she was nervous," and the judge at one point "told her she should testify in more detail." (Appellant's Brief at 44.) Appellant argues that later, during J.S.'s testimony, "she became emotional" and the judge "offered her tissues." (Appellant's Brief at 44.)

{¶ 88} The record indicates the trial judge, at the time J.S. was sworn in, inquired whether the witness was nervous. J.S. responded affirmatively, and the judge stated: "I can understand that. It's not easy to be in a courtroom. I want you to try to relax. You are going to be asked questions. You have to answer verbally, out loud. Use your outside voice, if you can. I know it's not easy." (Tr. Vol. 2 at 366.) As noted by the state, the trial court gave similar instructions to other witnesses and, on review, we discern no impermissible bias, and thus counsel was not ineffective in failing to raise an objection to the above statements.

{¶ 89} Regarding the trial court's comment about the need for J.S. to "explain in some detail" her testimony, we similarly find no demonstration of bias. (Tr. Vol. 2 at 391.) In general, "[t]he court can properly ask its own questions to develop relevant evidence or clarify matters." *State v. Middleton*, 1987 Ohio App. LEXIS 5540, *4 (8th Dist. Jan. 15, 1987), citing Evid.R. 614(B). In context, the trial court's comment here provided the witness an opportunity to clarify her response. *See, e.g.*, *Fetzek v. Lafon*, 1979 Ohio App. LEXIS 10238, *11 (10th Dist. Dec. 13, 1979) (trial court's questions to witness, designed to "clarify" what witness had done, demonstrated "no improper interference by the trial court with the quest for truth nor does the questioning indicate any bias on behalf of the trial court"); *State v. White*, 1995 Ohio App. LEXIS 2463, *12 (9th Dist. June 7, 1995) (trial

court's examination of witness "was merely an attempt to help [witness] recall his prior statement and clarify his answer" and did not demonstrate bias on the part of trial judge).

{¶ 90} In response to appellant's contention the trial judge showed bias by offering J.S. tissues during her testimony, the state maintains the court's act involved "a show of common courtesy" and not bias. (Appellee's Brief at 35.) We agree. As observed by one court, "[t]rials are frequently emotionally traumatic for witnesses who are personally involved in the events to which they are testifying" and "[a]cts of common courtesy should be encouraged, not discouraged." *State v. Richard*, 252 Kan. 872, 878 (1993) (holding that nothing in record indicates "trial judge exceeded any boundaries or levels of judicial propriety in handing a tissue to a crying witness"). Accordingly, we find no deficient performance by trial counsel in failing to object to the court's conduct.

{¶ 91} Appellant next contends his trial counsel was ineffective in failing to object to the trial court's request that counsel stipulate that a forensic nurse, Gail Hornor, was "an expert in this area" and "qualified to give expert opinions." (Tr. Vol. 4 at 523.) As noted by the state, however, Horner "has a significant history of testifying as an expert about clinical examinations." (Appellee's Brief at 38.) At trial, Hornor testified she had "examined close to 4,000 children where there's been a concern of sexual abuse." (Tr. Vol. 4 at 522.) This court has previously noted Hornor's qualifications. *See*, *e.g.*, *State v. Lee*, 2003-Ohio-4059, ¶ 33 (10th Dist.) (finding appellant counsel's failure to object to the trial court failing to recognize Hornor's expert witness status not prejudicial as "Hornor did testify that in the previous six years she had examined and assessed approximately 3,600 children in cases involving allegations of sexual abuse"). Accordingly, we agree with the state that any objection to Hornor's status as an expert witness stood no reasonable chance of success, and therefore counsel was not deficient in stipulating to her expertise.

{¶ 92} Appellant further asserts the trial court displayed irritation with appellant during his testimony, and repeatedly cut him off. In support, appellant cites two examples. Appellant first cites an inquiry by defense on direct examination in which counsel asked appellant to explain what he said to the detective regarding the bug bite incident. The court noted: "He's already testified to that." (Tr. Vol. 4 at 590.)

{¶ 93} In general, a trial court may impose reasonable limits on direct examination and cross-examination "based on a variety of concerns," including limitations on "repetitive

testimony." *State ex rel. J.M. v. Celebrezze*, 2023-Ohio-536, ¶ 5 (8th Dist.). On review, the record supports the trial court's observation that appellant had already testified as to what he told the detective about this incident, and we discern no bias by the court's request for counsel to move on from questions previously asked and answered by the witness.

{¶ 94} Appellant next cites an inquiry by defense counsel of appellant as to a dismissed criminal case involving a physical altercation between T.S. and appellant. When counsel asked appellant the reason the case was dismissed, the court stated: "Well, that's up to the prosecutor. How is he going to know why it got dismissed unless he has personal knowledge?" (Tr. Vol. 4 at 597.) Appellant responded that he did know the reason it was dismissed, stating "I did not want to see her get prosecuted at the time because we had kids." (Tr. Vol. 4 at 597.) Appellant further stated: "The reason why it got dismissed, of course, there's always -- they could have made a deal with her and all that, but I'm getting subpoenaed . . . [t]hey want me to show up." (Tr. Vol. 4 at 598.) The prosecutor then raised an objection, and the court told appellant to "[h]old on." (Tr. Vol. 4 at 598.) The prosecutor argued: "At this point, it is speculation, Your Honor." (Tr. Vol. 4 at 598.) The court then inquired of appellant: "It's simple. Did you show up to court with the subpoena?" (Tr. Vol. 4 at 598.) Appellant responded "[n]o," and the court stated: "Okay. Next question." (Tr. Vol. 4 at 598.)

{¶ 95} Here, in context, the record indicates the trial court acted to move the testimony along, and we do not find the court's ruling evinced impermissible bias against appellant. *See, e.g., State v. Nagel*, 2010-Ohio-3062, ¶ 78 (6th Dist.) (appellant failed to show bias by trial court where, from context of testimony, it appears court "was simply attempting to move the questioning along"). We further note the record indicates the trial court instructed both defense counsel and the prosecutor at various times to either speed up or move on to additional testimony. Accordingly, appellant has failed to demonstrate his counsel's failure to object was deficient performance or that he was prejudiced as a result of the failure to object.

{¶ 96} Appellant next contends the trial court, at the conclusion of the written jury instructions, made additional comments that were improper and prejudicial. Specifically, appellant argues the trial court erred in informing the jurors:

> Now, another thing I want to tell you, when you get back there
> -- I've only been doing this 44 years. When you get back there,

first question you have for me, where is that police report, where is that recording that was talked about, where is this. If you don't have it, you're not getting it. There's reasons for that. You're probably not going to have some things. You're, like, wonder where that is. So the exhibits that you have are all you're going to get. Sorry you're not getting police reports or anything else.

(Tr. Vol. 5 at 727.)

{¶ 97} According to appellant, the trial court's comments "suggested to the jury that there was additional evidence against [appellant] that was being kept from them." (Appellant's Brief at 46-47.) We disagree.

{¶ 98} As observed by the state, during trial the jury heard references to the police report, as well as a recorded audio involving Detective McGuire's interview of appellant. In context, the trial court's instruction that exhibits not admitted into evidence would not be provided to the jury during deliberations was neither inaccurate nor prejudicial. Further, to the extent appellant argues the court's statement suggested additional evidence, trial counsel may have made a strategic decision not to object to avoid drawing attention to any such inference.

{¶ 99} Appellant next argues his counsel was ineffective in failing to object to prosecutorial misconduct. Appellant maintains that on several occasions the prosecutor misstated the evidence or made unsupported claims. Appellant first contends that, while J.S. testified appellant made her touch his penis with clothes on, the prosecutor asked J.S. about appellant trying to make her touch his penis "without clothes on." (Tr. Vol. 3 at 421.)

{¶ 100} However, and as noted by the state, J.S. testified as to appellant trying to make her directly touch his penis, including J.S.'s affirmative response to an inquiry whether appellant would "ever want you to touch inside of his pants?" (Tr. Vol. 2 at 390.) J.S. further testified as to an incident in which appellant "had pulled his pants down" and "[h]e grabbed my head, and he forced his penis inside my mouth." (Tr. Vol. 2 at 392.) J.S. testified as to another incident in which she woke up in the middle of the night and "his penis was . . . in my face[,]" and he was "trying to put it in my mouth." (Tr. Vol. 2 at 394.) Contrary to appellant's assertion, the prosecutor's inquiry about touching "without clothes on" did not constitute a misstatement of the evidence, nor can appellant demonstrate

prejudice as a result of counsel's failure to object to the prosecutor's inquiry about this earlier testimony.

{¶ 101} Appellant next argues the prosecutor, in closing argument, improperly misstated the evidence to the jury. Specifically, appellant maintains the prosecutor misstated that Detective McGuire indicated appellant told inconsistent stories in explaining whether appellant had touched J.S.

{¶ 102} A review of the record indicates the prosecutor, during closing argument, recounted testimony regarding Detective McGuire's interaction with appellant, stating in part: "He [Detective McGuire] said the fact that [appellant] walked up to him was a little odd. But, again, after Detective McGuire talked to [appellant], he denied everything and then -- first he said, no, he didn't touch her[.] . . . Then he said, well, wait a minute, yes, I did -- I did touch her chest, but it was because she had bug bites." (Tr. Vol. 5 at 670.)

{¶ 103} The state argues that the prosecutor's statement aligns with the testimony presented. On review, we agree. At trial, appellant testified that Detective McGuire "first asked if I touched her. I said, 'No.'" (Tr. Vol. 4 at 589.) When the detective then "said, 'in a sexual way,'" appellant stated he "said, 'No, I did not touch her in a sexual way.' Her shirt, the way I explained to you, is what I was doing." (Tr. Vol. 4 at 589-90.) Defense counsel then asked appellant: "And that's when you were explaining to him about the bugbites?" (Tr. Vol. 4 at 590.) Appellant responded: "Yes." (Tr. Vol. 4 at 590.) In light of the testimony presented, appellant's contention that the prosecutor misstated the evidence is not persuasive, nor can he show that counsel's failure to object to the closing statement at issue constituted deficient performance.

{¶ 104} Appellant also contends his counsel was ineffective in failing to object to the expert testimony of employees of the child advocacy center, i.e., Sherfield and Hornor. Appellant maintains that introduction of the out-of-court statements of J.S. constituted inadmissible hearsay, and that the bulk of the experts' testimony involved vouching for and bolstering the claims of J.S. despite the fact J.S. actually testified. According to appellant, virtually all of Sherfield's and Hornor's questions, and J.S.'s responses, were forensic in nature and were not for medical diagnosis or treatment.

{¶ 105} In response, the state argues that neither Sherfield nor Horner testified to J.S.'s credibility. The state further maintains appellant fails to identify any specific testimony that constituted improper bolstering or fell outside Evid.R. 803(4).

{¶ 106} The Supreme Court has observed that in a child advocacy center, "[m]ultidisciplinary teams cooperate so that the child is interviewed only once and will not have to retell the story multiple times." *State v. Arnold,* 2010-Ohio-2742, ¶ 33. In this respect, a forensic interview "serves dual purposes: (1) to gather forensic information to investigate and potentially prosecute a defendant for the offense and (2) to elicit information necessary for medical diagnosis and treatment of the victim." *Id.*

{¶ 107} Evid.R. 803(4) provides "a hearsay exception for '[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.' " *State v. Cashin*, 2009-Ohio-6419, ¶ 16 (10th Dist.), quoting Evid.R. 803(4).

{¶ 108} Evid.R. 803(4) applies when a child provides a child advocacy center employee "with information that is necessary for medical treatment or diagnosis." *State v. J.W.*, 2013-Ohio-804, ¶ 18 (10th Dist.), citing *State v. Schmidt*, 2009-Ohio-1548, ¶ 10 (10th Dist.) *See also State v. Aponte-Rodriguez*, 2025-Ohio-2631, ¶ 38 (7th Dist.) ("A child victim's statements made to social workers and Child Advocacy Center medical professionals for the purpose of facilitating medical diagnosis or treatment are generally admissible under the Evid.R. 803(4) medical exception to the hearsay rule in sexual abuse cases."). In general, statements provided "while a medical professional obtains a victim's history, such as whether a defendant's penis entered the victim's vagina, . . . fall within the medical-diagnosis-and-treatment exception," and "statements that identify a defendant as the perpetrator of a crime, where the defendant touched the victim, and how sexual contact occurred ordinarily are statements obtained for medical diagnosis and treatment." *State v. Sims*, 2023-Ohio-1179, ¶ 78 (4th Dist.), citing *Arnold* at ¶ 37-38, and *State v. Felts*, 2016-Ohio-2755, ¶ 39 (4th Dist.), citing *Arnold* at ¶ 32, 38. By contrast, "statements merely serve an investigative purpose when they do not help the treatment provider diagnose a medical condition or recommend treatment." *Sims* at ¶ 79.

{¶ 109} In the present case, Sherfield, a forensic interview specialist, conducted a forensic interview of J.S. at the Child Advocacy Center ("CAC") at Nationwide Children's Hospital, and Sherfield prepared a report as a result of the interview. Sherfield testified as to the model for forensic interviews, stating that such interviews at CAC are used "for medical diagnosis and treatment." (Tr. Vol. 2 at 319.) Sherfield, who stated she prepared a written report of her interview, identified the state's exhibit C as "the complete medical record from the visit for [J.S.] and then my report." (Tr. Vol. 2 at 329.) In that report, Sherfield made a treatment recommendation. According to Sherfield, "[t]he full medical report would be completed by the forensic interviewer, the mental-health advocate and the medical provider." (Tr. Vol. 2 at 330.) Hornor, a pediatric nurse practitioner, testified she performed a "head-to-toe" physical exam of J.S. at the CAC. (Tr. Vol. 4 at 530.) Horner testified that J.S. "declined the anogenital exam." (Tr. Vol. 4 at 530.) Hornor completed the medical exam form for J.S., which included several medical tests.

{¶ 110} Here, the record indicates statements made to Sherfield and Hornor by J.S. were for the purpose of medical diagnosis and treatment and therefore were admissible under Evid.R. 803(4). Further, the record does not indicate that either witness vouched for the credibility of J.S. On review, we find trial counsel was not ineffective in failing to raise a hearsay objection. *See Cashin*, 2009-Ohio-6419, at ¶ 18 (10th Dist.) (where it was undisputed some of victim's statements to medical social worker were for purpose of obtaining medical diagnosis and treatment, it was within discretion of trial court to admit social worker's testimony under Evid.R. 803(4), "and trial counsel was therefore not ineffective for failing to raise a hearsay objection").

{¶ 111} Appellant next contends his trial counsel was ineffective in cross-examining J.S. Appellant maintains that defense counsel's cross-examination began with "a bevy of utterly irrelevant questions," and that counsel failed to focus on J.S.'s failure to disclose abuse to adults over a period of months. (Appellant's Brief at 59.)

{¶ 112} In general, " ' "[t]he extent and scope of cross-examination clearly fall within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." ' " *State v. Trout*, 2020-Ohio-3940, ¶ 38 (4th Dist.), quoting *State v. Guysinger*, 2017-Ohio-1167, ¶ 27 (4th Dist.), quoting *State v. Leonard*, 2004-Ohio-6235, ¶ 146. Further, " ' "[a]n appellate court reviewing an ineffective assistance of counsel claim

must not scrutinize trial counsel's strategic decision to engage, or not engage, in a particular line of questioning on cross-examination." ' "  *Id.*, quoting *State v. Dorsey*, 2005-Ohio-2334, ¶ 22 (10th Dist.), quoting *In re Brooks*, 2004-Ohio-3887, ¶ 40 (10th Dist.).

{¶ 113} The record indicates defense counsel began cross-examination by asking J.S. about her interests and hobbies. Counsel also asked J.S. about her relationship with her other family members, including her brothers and sisters, as well as her relationship with T.S. Counsel questioned J.S. about the alleged incident in July 2019, and asked if she recalled telling the law enforcement officer that appellant's house "had bedbugs, and you had, like, 100 bugbites over you." (Tr. Vol. 3 at 467.) J.S. acknowledged she told the officer appellant had not touched her inappropriately. Counsel asked J.S. if she recalled telling the officer T.S. previously "had lied on [appellant] before." (Tr. Vol. 3 at 468.) Defense counsel questioned J.S. about whether she knew when text messages had been sent, and J.S. responded she was "not sure." (Tr. Vol. 3 at 469.) Counsel also asked J.S. about her failure to say anything to anyone in the house that day about the texts.

{¶ 114} Ohio courts recognize that "the cross-examination of a child victim is a tactical decision that must be made by counsel." *State v. Smith*, 1992 Ohio App. LEXIS 1271, *10 (6th Dist. Mar. 20, 1992). As noted above, debatable tactics " 'do not render counsel's assistance ineffective,' " and " '[t]his is particularly true in sex cases with minor victims where counsel may be wise to tread lightly in questioning.' " (Further citations omitted.) *State v. Williams*, 2017-Ohio-8898, ¶ 22 (1st Dist.), quoting *State v. Johnson*, 2016-Ohio-4934, ¶ 29 (1st Dist.).

{¶ 115} Here, while appellant contends trial counsel began the cross-examination of J.S. with irrelevant questions, counsel could have reasonably made a strategic decision to avoid a vigorous cross-examination of J.S., who was emotional during direct examination. *See*, *e.g.*, *Guysinger*, 2017-Ohio-1167, at ¶ 29 (4th Dist.) ("Trial counsel could have been wary about a contentious cross-examination" of 13-year-old victim, "who had testified emotionally on direct examination."). Further, during cross-examination, defense counsel was able to show that J.S. did not report the texts to her family members at the time, and that she told the law enforcement officer appellant had not touched her inappropriately. To the extent trial counsel engaged in a limited cross-examination, "[v]arious reasons exist to support the tactical decision to conduct a very brief cross-examination of [a] child victim,"

and counsel may have concluded such strategy was appropriate to avoid alienating the jury. *Id.* On review, appellant has not overcome the "strong presumption that the actions were part of a valid trial strategy." *State v. Kordeleski*, 2003-Ohio-641, ¶ 39 (9th Dist.), citing *Strickland*, 466 U.S. at 689.

{¶ 116} Appellant's final contention is that his counsel was ineffective during closing argument. Specifically, appellant cites comments by trial counsel during closing stating "it doesn't look good" and that "[t]his case doesn't look good." (Tr. Vol. 5 at 700.) According to appellant, trial counsel's comments reflected "wholesale abandonment of his duty to serve as a loyal and zealous advocate for his client." (Appellant's Brief at 61.) We disagree.

{¶ 117} In general, "[t]he substance of closing argument falls within the realm of trial strategy." *State v. Cameron*, 2009-Ohio-6479, ¶ 31 (10th Dist.), citing *State v. Ruiz*, 1999 Ohio App. LEXIS 2884, *28 (8th Dist. June 24, 1999); *State v. Sharpless*, 1998 Ohio App. LEXIS 6162, *25 (11th Dist. Dec. 18, 1998). *See also State v. Turks*, 2009-Ohio-1837, ¶ 42 (3d Dist.), citing *State v. Williams*, 2008-Ohio-3887, ¶ 70 (3d Dist.), citing *State v. Smith*, 2007-Ohio-5119, ¶ 18 (9th Dist.) ("[T]he manner and content of trial counsel's closing arguments are a matter of trial strategy and do not constitute ineffective assistance of counsel.").

{¶ 118} Here, while trial counsel's comments may have reflected a candid assessment of the case, they were not outside the realm of trial strategy. *See, e.g., State v. Campbell*, 2000-Ohio-183, ¶ 107 (Counsel, despite using words such as "gruesome" or "senseless" to describe crime, "may have sought to impress the jury with their candor, hardly an unreasonable tactic."). In context, the comments were followed by defense counsel reminding the jurors of the "beyond a reasonable doubt" standard, and asking them to "explore each and every area of doubt that you individually and collectively find" which, counsel asserted, would leave them with "no alternative but to . . . vote not guilty." (Tr. Vol. 5 at 700.) The record also indicates counsel vigorously argued for appellant during closing argument. We note that part of trial counsel's strategy was to cast doubt on the testimony of T.S. regarding the alleged incident on July 17, 2019, for which the jury acquitted appellant of the charge of sexual imposition. On review, appellant has failed to demonstrate he received ineffective assistance of counsel.

{¶ 119} Based on the foregoing, appellant's second assignment of error is not well-taken and is overruled.

{¶ 120} Under his third assignment of error, appellant argues his convictions are against the manifest weight of the evidence, asserting "the greater amount of evidence, and the more persuasive evidence, supported acquittal." (Appellant's Brief at 66.)

{¶ 121} We initially note "[t]he legal concepts of sufficiency of the evidence and weight of the evidence involve different determinations." *State v. M.L.D.*, 2016-Ohio-1238, ¶ 45 (10th Dist.). In considering a sufficiency challenge, "we construe the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt." *Id.*, citing *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 122} By contrast, "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.* at ¶ 8, citing *State v. Thompkins*, 1997-Ohio-52, ¶ 25. Further, a reviewing court "should reverse a conviction as against the manifest weight of the evidence in only the most 'exceptional case in which the evidence weighs heavily against conviction,' instances in which the jury 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 123} In seeking reversal on manifest weight grounds, appellant asserts his version of the events was consistent and more accurate and truthful than that of J.S. According to appellant, in contrast to the "shifting narratives" of J.S., his testimony that he did not engage in any sexual touching of J.S. was "consistent and credible." (Appellant's Brief at 67.)

{¶ 124} While appellant's assigned error does not challenge the sufficiency of the evidence, the record indicates the state presented evidence as to each of the elements of the offenses of gross sexual imposition and attempted rape. Pursuant to R.C. 2907.05(A)(4), the offense of gross sexual imposition prohibits "sexual contact" with a person "less than thirteen years of age." R.C. 2907.01(B) defines sexual contact to mean "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic

region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." Attempted rape is defined under R.C. 2923.02 and 2907.02(A)(1)(b) as attempting to "engage in sexual conduct with another when . . . [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person."

{¶ 125} At trial, J.S. testified appellant began making comments about her body and engaged in inappropriate hugs beginning when she was around 11 years of age. J.S. testified that she recalled "lots of times" when appellant "would try to make me . . . touch or rub his penis area." (Tr. Vol. 2 at 388.) She stated appellant asked her to touch his penis on both the outside and inside of his clothing. J.S. further testified appellant "would touch my vagina and my boobs and my butt" while she was clothed, and that "[h]e just stopped when he wanted to." (Tr. Vol. 3 at 424.)

{¶ 126} J.S. related an incident when "I woke up in the middle of the night" and appellant "was hovering over me" with "his penis . . . in my face . . . trying to put it in my mouth, but I kept trying to move away." (Tr. Vol. 2 at 394.) She stated his penis did not go "all the way" in her mouth "but it did touch my mouth." (Tr. Vol. 2 at 395.) J.S. recounted another incident when she and appellant were seated in a van and "[h]e had pulled his pants down" and "[h]e grabbed my head, and he forced his penis inside my mouth." (Tr. Vol. 2 at 392.) At the time, J.S. "was trying to move" but "[h]e wasn't letting me. He just kept pushing my head down." (Tr. Vol. 2 at 392.) J.S. further testified she recognized a text conversation with appellant in which he asked if they could be alone in a room and indicated he wanted her to " '[h]old it in your mouth for a second. . . . It helps me so much.' " (Tr. Vol. 3 at 435.)

{¶ 127} Appellant testified he first met his daughter J.S. when she was seven years of age, after he was released from prison; although their relationship is now estranged, appellant felt his prior relationship with J.S. "was good." (Tr. Vol. 4 at 567.) Appellant denied all of the allegations of inappropriate sexual conduct and he also denied having sent the text messages at issue. On cross-examination, appellant stated he learned about the texts on July 19, 2019, but he did not ask about the content of the text messages at that point. Also on cross-examination, appellant responded affirmatively when asked if J.S. was "lying about all of it." (Tr. Vol. 4 at 640.)

{¶ 128} On review, this is not the exceptional case in which the evidence weighs heavily against the convictions. Here, the jury chose to believe the testimony of J.S. over that of appellant, and such "[c]redibility issues remain within the province of the trier of fact." *State v. Calloway*, 2006-Ohio-1027, ¶ 11 (10th Dist.). *See also In re C.S.*, 2012-Ohio-2988, ¶ 31 (10th Dist.), citing *In re L.J.*, 2012-Ohio-1414, ¶ 23 (10th Dist.), citing *State v. Smith*, 2005-Ohio-1765 (10th Dist.) ("The trier of fact was free to believe or disbelieve any part of the witnesses' testimony, and a conviction is not against the manifest weight of the evidence merely because the trier of fact believed the victim's testimony."). Accordingly, the jury was free to credit J.S.'s testimony, establishing the offenses of gross sexual imposition and attempted rape, and to reject appellant's denial of any sexual contact with her. The trier of fact could have also found J.S.'s testimony corroborated by the text messages.

{¶ 129} Appellant maintains J.S. was inconsistent in that she initially denied to the detective any inappropriate touching but subsequently came forward with her allegations. J.S. explained, however, she did not disclose these incidents earlier because she did not want her mother "to feel like it was her fault." (Tr. Vol. 3 at 442.) Further, under Ohio law, "[a] defendant is not entitled to a reversal on manifest-weight grounds merely because inconsistent evidence was offered at trial." *In re C.S.* at ¶ 27, citing *State v. Campbell*, 2008-Ohio-4831 (10th Dist.). Rather, "[t]he trier of fact is in the best position to take into account the inconsistencies in the evidence, as well as the demeanor and manner of the witnesses, and to determine which witnesses are more credible." *Id.*, citing *State v. Williams*, 2002-Ohio-4503 (10th Dist.).

{¶ 130} Having reviewed the record, we find that the jury, in resolving conflicts in the evidence, did not clearly lose its way and create a manifest miscarriage of justice in convicting appellant of gross sexual imposition and attempted rape. Accordingly, we reject appellant's contention that his convictions are against the manifest weight of the evidence, and we overrule the third assignment of error.

{¶ 131} Under his fourth assignment of error, appellant contends his convictions must be reversed due to cumulative error. In support, he again maintains he was deprived the right to be present for juror strikes, and reiterates arguments that his trial counsel was

ineffective in failing to object at various points, in conducting cross-examination of J.S., and by comments made during closing argument.

{¶ 132} This court has noted that, "[u]nder the doctrine of cumulative error, 'a judgment may be reversed where the cumulative effect of errors deprives a defendant of his constitutional rights, even though the errors individually do not rise to the level of prejudicial error.' " *Zhu*, 2021-Ohio-4577, at ¶ 70 (10th Dist.), quoting *State v. Johnson*, 2010-Ohio-5440, ¶ 34 (10th Dist.), citing *State v. Garner*, 1995-Ohio-168, ¶ 62.  In the context of an ineffective assistance claim, "[e]ach assertion of ineffective assistance of counsel going to cumulative error depends on the merits of each individual claim," and "when none of the individual claims of ineffective assistance of counsel have merit, cumulative error cannot be established simply by joining those meritless claims together." *State v. Graham*, 2020-Ohio-6700, ¶ 170, citing *State v. Dean*, 2015-Ohio-4347, ¶ 296; *State v. Mammone*, 2014-Ohio-1942, ¶ 173.

{¶ 133} Given our disposition of the second assignment of error, and having found no merit to any of appellant's individual claims of ineffective assistance of counsel, appellant's cumulative error argument fails.  *See Zhu* at ¶ 71 ("Because none of [appellant's] ineffective assistance of counsel claims have merit, he cannot demonstrate cumulative error."); *State v. Cline*, 2006-Ohio-4782, ¶ 29 (10th Dist.) ("Finding no instances of ineffective assistance of counsel, we find no cumulative error as a result of the combined effect of the alleged instances of ineffective assistance of counsel.").

{¶ 134} Appellant's fourth assignment of error is therefore overruled.

{¶ 135} Under his fifth assignment of error, appellant asserts the trial court erred in calculating his jail-time credit.  Appellant argues he was jailed for 50 days prior to sentencing, but the court credited him with just 10 days of jail-time credit.  In support, appellant has supplemented the record with documents from the Franklin County Correction Center reflecting several booking and release dates which, appellant maintains, yield a total of 50 days of jail-time credit.

{¶ 136} R.C. 2967.191 states in part: "The department of rehabilitation and correction shall reduce the prison term of a prisoner . . . by the total number of days that the prisoner was confined for any reason arising out of the offense for which the prisoner was convicted and sentenced, including confinement in lieu of bail while awaiting trial[.]"

{¶ 137} In response to appellant's argument, the state "agrees" appellant should receive "50 days of jail-time credit, plus any time accrued while waiting to enter ODRC custody." (Appellee's Brief at 67.)  The state therefore argues this matter should be remanded to the trial court "for a nunc pro tunc entry correcting the credit awarded." (Appellee's Brief at 67.)

{¶ 138} In light of the state's concession, as well as the supplemental record which appears to indicate appellant was confined for periods not recognized by the trial court's entry granting him 10 days jail-time credit, we sustain appellant's fifth assignment of error. Thus, while we affirm appellant's convictions and sentence, we remand this matter to the trial court for the limited purpose of properly calculating appellant's jail-time credit.

## IV. Conclusion

{¶ 139} Based on the foregoing, appellant's first, second, third, fourth, and sixth assignments of error are overruled, and appellant's fifth assignment of error is sustained. The judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part, and this matter is remanded to the trial court to recalculate appellant's jail-time credit.

*Judgment affirmed in part and reversed in part;*
*cause remanded with instructions.*

MENTEL and DINGUS, JJ., concur.